## GULBRANSON *v.* HART ET AL.

[No. 13,482.   Filed October 30, 1929.]

*Halleck & Halleck,* for appellant.
*Hanley & Hanley,* for appellees.

NICHOLS, J.—Action by appellant by complaint in five paragraphs.   The first paragraph avers that appellees are doing a general banking business, as partners, as the "Bank of DeMotte," that they are indebted to appellant in the sum of $222.50 for money had and

received by appellees for the use and benefit of appellant, which sum is due and unpaid.

The second paragraph avers that on or about June 20, 1927, appellees were partners doing a general banking business in DeMotte, Indiana, under the name of "Bank of DeMotte"; that on said date, one Harold Hockney was a patron of said bank and had a checking account therein; that he was under 20 years of age and was engaged in the business of buying hogs and cattle in DeMotte and its vicinity for resale in the Chicago market, all of which was well known to appellees; that, on said June 20, 1927, appellant was a farmer and resided on a farm near DeMotte; that, at said time, there was not on deposit in said bank to the credit of Hockney funds sufficient to pay the checks he was issuing on said bank for live stock which he was buying in his business; that at said time there was an agreement between Hockney and the bank to the effect that he should purchase hogs and cattle from the farmers and stock raisers and pay the purchase price thereof to the sellers by checks issued by him on said bank, the bank would pay said checks when presented for payment, the hogs and cattle so purchased as aforesaid would be by Hockney delivered to the bank at some railroad station and by it consigned in its name to some live-stock commission firm at Chicago to be sold in the market, and the proceeds of said sale to be paid by the consignee of such shipment to the bank, and by it applied to reimburse it for sums by it advanced to pay the checks issued for said live stock; that on or about June 20, 1927, he sold and delivered to Hockney live stock of the reasonable value of $222.50, and Hockney gave to appellant, in payment thereof, his check upon said bank for $222.50; that appellant was not informed as to the financial worth or standing of Hockney, and he inquired of the cashier of the bank, before delivering

said stock, and was informed by him that said check would be paid by said bank on presentation; that appellant relied on said information, and delivered said stock and accepted said check of Hockney, and afterward deposited it in the bank of Wheatfield, at Wheatfield, Indiana, for credit on his account; that the live stock was, by Hockney, with other stock purchased by him, loaded in a freight car at DeMotte, and delivered to appellees, and was by them, in their bank name, consigned to the Union Stock Yards, Chicago, and was by them sold for the account of said bank, and the proceeds were remitted to the bank, and it received the same; that about said time, one Hunter was indebted to said bank about $3,700, and he was claiming Hockney was indebted to him about $4,000, which claim was unfounded, and appellees, as such bank, wrongfully and in disregard of the rights of appellant, applied said moneys so received by them in payment of said indebtedness to them by Hunter, and wrongfully failed and refused to pay the check for $222.50 issued to appellant in payment for said stock, and caused said check to be protested and returned to said bank of Wheatfield unpaid, and with protest charges of $2.08; that no part of said check or of the value of said live stock has ever been paid; that there is due appellant from appellees as the reasonable value of said stock $222.50 and interest thereon from June 30, 1927, at six per cent.

The third paragraph avers that on June 20, 1927, appellant sold and delivered to appellees the live stock for $222.50, then agreed to be paid therefor by them within a reasonable time thereafter, and that said sum is due and unpaid.

The fourth paragraph avers that, on June 20, 1927, appellees were indebted to appellant in the sum of $222.50, and, in payment thereof, they drew their check, by Hockney, their agent, and thereby requested the

Bank of DeMotte to pay appellant $222.50, and, by their said agent, delivered the same to appellant; that appellant, on June 30, 1927, caused said check to be presented to said bank, and demanded payment, which was refused; that said check is due and unpaid.

The fifth paragraph avers that appellees are indebted to appellant for such live stock sold and delivered by appellant to appellees in June, 1927, in the sum of $222.50; that said sum is due and unpaid and there has been unreasonable delay in the payment thereof. Reply in general denial.

The cause was submitted to a jury and the motion of appellees, at the conclusion of the evidence, to direct a verdict for appellees was sustained, the jury was so instructed and returned a verdict accordingly, from the judgment on which, this appeal. This action of the court was given as a reason for a new trial, the overruling of which is assigned as error.

It appears by the evidence that in June, 1927, Harold Hockney was a boy 19 years of age. He had lived in DeMotte practically all of his life. He had no property and no financial backing. For some reason, he entered upon the purchase of live stock for the purpose of resale. His first purchase as a part of these transactions was of one Isaac T. Hunter. 'Hockney agreed to pay a sum in excess of $4,000 for certain steers belonging to Hunter, and on which the Bank of DeMotte, appellees' bank, held a mortgage for $2,286.42, principal and interest. Hockney paid $200 down to Hunter by a check on the Bank of DeMotte. The cashier of the bank told Hockney that it would be all right to purchase cattle necessary to complete the two cars in which the cattle of Hunter were to be shipped, if he would ship them in the bank's name. Thereupon, Hockney did purchase nine head of cattle from one

Schlatzley. These two cars were shipped from Kersey, Indiana, in the name of the Bank of DeMotte.

About the same time, Hockney began buying other stock in the vicinity of DeMotte, issuing checks on the Bank of DeMotte therefor. He purchased sufficient stock to make up two carloads. The stock was hauled by truck to DeMotte, where it was placed in the stock yards. On June 20, Hockney called at the home of appellant and bargained with him for certain cattle, agreeing to pay him $222.50 for them, and drawing and delivering to him at the time a check for that amount. After Hockney left, but while the cattle were still on his place and in his possession, appellant called Mr. Rathburn, the cashier of the Bank of DeMotte and asked him if a check on Hockney for $222.50 would be good. He said: "Right now the money isn't here, but he is shipping some stuff, and, as soon as the money comes back, it will be all right. Put the check in the Wheatfield Bank and, by the time it comes here, the money will be here." Appellant further said to the cashier that the stuff was in the yard and, if the check wasn't good, he wasn't going to let the stuff go, and the cashier said: "I think the check will be all right." Thereupon, appellant allowed Hockney to take his cattle, taking the check therefor, which check he put in the Wheatfield Bank, and it came back protested.

On June 21, the cattle of appellant and of others to the extent of two carloads were in the stockyards at DeMotte. Rathburn, the cashier of the bank, went down to the stockyards and said to Bruce Summers, who was working for Hockney, that he wanted to see Hockney about the checks that were coming in; that if Hockney would ship the stuff in the name of the bank, the bank would pay the checks.

Thereafter, on June 21, Hockney and Rathburn, the cashier, went to the depot and Rathburn billed the stuff

out, in the name of the bank, signing the shipping order in the name of the Bank of DeMotte. At that time, the cashier said to Hockney that if he would bill the stuff in the name of the bank, the bank would honor the checks.

On June 22, 1927, Rathburn, Hunter and Hockney went to Chicago relative to the shipment of cattle; on that trip, Rathburn received the bills of sale of the two cars in which cattle of appellant were shipped, for the Bank of DeMotte, and the bank has continuously had them in its possession since that time. On the next morning, being June 23, the Bank of DeMotte received a letter of credit from a Chicago bank for the two cars of cattle in which the cattle of appellant were shipped.

The balance sheet of Hockney's account with the Bank of DeMotte shows that the bank placed to his credit on June 22, the sum of $4,546.51, being returns for all four cars of stock shipped. Returns for the two cars containing appellant's cattle were credited to Hockney's account in the sum of $1,999.70 before the returns were received by the bank.

On the evening of June 22, Hockney met appellee Hart, president of the Bank of DeMotte, and Hunter in the bank. They there discussed the fact that Hunter's cattle had not paid out by about $2,000. Hockney said there that the second two cars had paid out and those checks would have to be paid. It was there agreed that he should attempt to have a note executed to the Bank of DeMotte for $2,000 to raise money to pay Hunter the balance of his contract price. After Hockney left, Hunter obtained from him a check for $3,700, which was put through the bank the first thing the next morning, practically depleting Hockney's account. Four or five checks left with the bank for collection against Hockney's account on June 22 were not paid, and the cashier was not able to say why they were not

paid, regardless of the fact that his account on that day was more than $4,500. Thereafter, Hockney said to appellee Frank Hart that he could not get the note signed and Hart then told him that they had what they had coming, and he could look after the rest. Hockney had an overdraft on June 20 of $189.70.

In considering the questions here presented, it is well first for us to have before us some well-established general principles of law that are of controlling force herein.

It is well established that a peremptory instruction should not be given unless there is a total lack of evidence upon some material issue, or where there is no conflict, and the evidence is susceptible of but one inference, and that inference is favorable to the party asking the instruction. *Engle, Admr.,* v. *Director General Railroads* (1921), 78 Ind. App. 547, 133 N. E. 138; *Cleveland, etc., R. Co.* v. *Gossett* (1909), 172 Ind. 525, 87 N. E. 723.

The trial court, before it gives a peremptory instruction, must accept as true all facts which the evidence tends to prove, and must draw against the party asking the instruction all inferences which the jury might reasonably have drawn, and if there are legitimate inferences tending to support the right of recovery in favor of one against whom the instruction is asked, the question should be left to the jury. *Mathews* v. *Myers* (1917), 64 Ind. App. 372, 115 N. E. 959; *Lyons, Admx.,* v. *City of New Albany* (1913), 54 Ind. App. 416, 103 N. E. 20; *Roberts* v. *Terre Haute Elec. Co.* (1905), 37 Ind. App. 664, 76 N. E. 325, 895; *Gasco* v. *Tracas* (1927), 85 Ind. App. 591, 155 N. E. 179; *Kearns* v. *Burling* (1896), 14 Ind. App. 143, 42 N. E. 646.

In 2 Ency. Pleading and Practice p. 1018, it is stated that: "The count for money had and received is sus-

tainable where money has been paid by mistake, or upon a consideration which happens to fail; or for money obtained through imposition, extortion, or oppression, or an undue advantage taken of plaintiff's situation, contrary to the laws made for the protection of persons under those circumstances."

In *Boos* v. *Lang* (1904), 163 Ind. 445, 71 N. E. 120, the rule is thus stated: "The rule is well affirmed that where one is shown to have received the money of another, and has not the right in equity or good conscience to retain it, in an action to recover it by the true owner a privity will be implied between him and the receiver, as well as a promise to pay. In fact the general rule, as affirmed by the authorities, is that an action for money had and received will lie where the facts show that the defendant has received money which *ex aequo et bono* belongs to the plaintiff, whether there be a privity or not between the parties."

In *Indiana Business College* v. *Cline* (1918), 187 Ind. 416, 119 N. E. 712, L. R. A. 1918E 779, the court said: "It has been frequently said that the action [for money had and received] lies to recover back money which ought not to be kept; for money which *ex aequo et bono* the defendant ought to return; for money which the defendant upon the circumstances of the case and by the ties of natural justice is under obligation to refund; for money got through imposition, extortion, oppression, or by fraud, mistake, or by undue advantage taken of plaintiff's situation."

In *Lemans* v. *Wiley* (1884), 92 Ind. 436, the court said: "An action of assumpsit for money had and received is an equitable remedy that lies in favor of one person against another, when that other person has received money either from the plaintiff himself or third persons, under such circumstances, that in equity and good con-

science he ought not to retain the same, and which, *ex aequo et bono*, belongs to the plaintiff.''

In *Ashton* v. *Shepherd* (1889), 120 Ind. 69, 22 N. E. 98, the court said: ''For money had and received the action is equitable, and is based, not upon a promise, but upon the fact of the receipt of money by one from another through the medium of oppression, imposition, extortion or deceit, or by mistake of fact, or without consideration, or upon a consideration that has failed, from which the law implies a promise to repay.''

In *Hatten* v. *Robinson* (1838), 4 Blackf. (Ind.) 479, the court stated the general principles governing actions for money had and received to be that the defendant must have come into the possession of money which he cannot conscientiously withold from the plaintiff.

In the light of these well-established principles of law, let us consider the facts of this case. When appellant called appellee's cashier and inquired as to whether there were any funds in appellee's bank for the payment of his check, he was informed that there were none, but that there would be by the time appellant's check, in due course, would reach appellee's bank. Appellees, by their cashier, were then informed by appellant that if the check was not good, he would not let the cattle go, and appellees knew that appellant would not have permitted Hockney to remove his cattle but for the assurance that the money would be there to take care of his check. Appellees, with such knowledge and acting thereon, induced Hockney to transfer appellant's cattle and the cattle of others to them, by promising to pay outstanding checks therefor. They did not pay appellant's check, and they paid no consideration to Hockney for appellant's cattle, but shipped them in their own name, sold them and received the pay therefor. Thereafter, though the cattle in the two cars containing appellant's cattle sold for enough to pay the mentioned

outstanding checks, appellees did not pay them. The jury might well have found that appellees, having obtained possession of appellent's cattle, with knowledge that they were not paid for, and, by their promise to make payment of such outstanding checks, held them and the proceeds of the sale thereof in trust for the holders of such outstanding checks, and, having converted them and the proceeds of the sale thereof to their own use, they were liable to appellant.

If we assume that appellees acted in good faith up until the time the cattle were sold in Chicago, we then have this situation: Hunter's cattle did not sell for the amount Hockney had agreed to pay for them by about $2,000, and Hockney did not have sufficient money with which to pay him. The cattle in the other two cars had sold for enough to pay the checks therefor, and leave a profit of about $300. In a conference at the bank, on the night of June 22, 1927, by Hockney, Hart, the president of the bank, and Hunter, Hockney told them that the two cars for which the checks were outstanding had sold for enough to pay the checks, and they must be paid. Hockney then left and Hunter soon thereafter followed and had a conference with Hockney that night, in which he induced Hockney to give him a check for $3,700 with which he returned to the bank early the next morning, deposited the check to his own account and immediately paid the bank the amount of its chattel mortgage and other debts which he owed the bank, appellees thereby receiving all, or substantially all, of the proceeds of the $3,700 check, knowing at the time that Hunter's stock had sold for but $2,100, and that $1,600 of the check was from the proceeds of the sale of the cattle of appellant and others, for which cattle the checks which appellees had agreed to pay were outstanding, some of which had been left at the bank to be paid as soon as the money came in.

Appellees during all this time knew that they had obtained possession and control of the cattle and the proceeds of the sale thereof by their promise to Hockney to pay the checks, and that appellant would not have surrendered possession of his cattle except for appellees' assurance that the money would be in the bank by the time appellant's check reached it. Under such circumstances, the jury could not have found otherwise than that appellees held appellant's cattle and the proceeds of the sale thereof in trust for him for the payment of his check, and, acting with Hunter and Hockney, converted such proceeds to their own use, with full knowledge that the cattle had not been paid for.

The jury might have found that Hockney was a fraudulent vendee, and that he transferred the possession of the cattle of appellant to appellees who took them with full knowledge of the fraud which had been practiced by Hockney to obtain them from appellant, and that appellees were not *bona fide* purchasers of the cattle and parted with no consideration to obtain them, unless it was their promise to pay the checks issued, and which they did not pay. Having received them in their own right, sold them in their own name, received the bill of sale therefor in their own name, and received the money for them, all with the knowledge aforesaid, under such circumstances, the jury must have found that they were liable to appellant for the value of his cattle, as evidenced by the amount of his check, and that, in equity and good conscience, they should not be permitted to retain the money which rightfully belongs to appellant.

The court erred in directing the verdict.

Reversed.